**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR HABEAS RELIEF** |
| | ) | |
| vs. | ) | Case No. 1:20-cr-028 |
| | ) | |
| Derrick Stephen Walker, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| Derrick Stephen Walker, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 1:24-cv-064 |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before the Court is the Defendant's "Motion to Vacate under 28 U.S.C. § 2255" filed on April 23, 2024. See Doc. No. 195. The Defendant filed a supplement to his motion on July 2, 2024. See Doc. No. 204. The Government filed a response in opposition to the motion on September 3, 2024. See Doc. No. 209. The Defendant filed a reply brief on March 31, 2026. See Doc. No. 221. For the reasons outlined below, the motion is denied.

## I.   BACKGROUND

### A.   Procedural Background

On February 6, 2020, a federal grand jury returned an eight-count indictment against Derrick Walker and Katie Heidinger, jointly charging them with six counts of sexual exploitation of a child under 18 U.S.C. §§ 2251(b) and 2251(e). See Doc. No. 2. The indictment also charged Heidinger

with one count of distribution of images depicting the sexual exploitation of children under 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and Walker with one count of receipt of images depicting the sexual exploitation of children under 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1). See Doc. No. 2.

On June 16, 2024, Heidinger pled guilty pursuant to a written plea agreement and agreed to cooperate in the prosecution of Walker. See Doc. Nos. 35, 36, and 47. After multiple continuances, Walker went to trial on January 24, 2022, and was convicted two days later. See Doc. No. 133. On June 22, 2022, Heidinger was sentenced to 360-months of imprisonment and Walker was sentenced 540-months of imprisonment. See Doc. Nos. 159 and 161. Walker appealed, and his conviction was affirmed on May 18, 2023. United States v. Walker, 68 F.4th 387 (8th Cir. 2023). Walker timely filed the current Section 2255 motion on April 23, 2024. See Doc. No. 195. The motion has been fully briefed and is ripe for consideration.

### B.    The Victims

To protect the identity of the child victims in this matter, the Court will refer to them as numbered John or Jane Does as follows:

John Doe 1    Six-year-old male victim, child of Katie Heidinger;

John Doe 2    Three-year-old male victim, child of Katie Heidinger;

John Doe 3    One-year-old male victim, child of Katie Heidinger;

John Doe 4    Four-year-old male victim, child of a friend of Katie Heidinger;

Jane Doe 1    One-year-old female victim, child of a friend of Katie Heidinger, twin sister of Jane Doe 2; and

Jane Doe 2    One-year-old female victim, child of a friend of Katie Heidinger, twin sister of Jane Doe 1.

C.      **Factual Background**

On January 7, 2020, law enforcement in McHenry County, North Dakota, received a call from Darren Heidinger, who suspected his wife, Katie Heidinger, was sexually abusing their one-year-old child and creating videos of the molestation.  Darren and Katie Heidinger have three male children together, who at the time were ages six, three, and one (John Does 1-3).  Prior to calling law enforcement, John Doe 1 told Darren that Katie recently took John Does 1, 2, and 3 to another man's house, and that his mother and the man did "mommy and daddy things" in the man's bedroom.  John Doe 1 called the other man "Daddy D."  John Doe 1's revelation came at a time when Darren already suspected his wife was having an extramarital affair with his coworker, Derrick Walker, who went by the alias "Daddy D."  Darren decided to check Katie's phone for evidence.  Following a struggle in which he suffered a broken thumb, Darren took Katie's phone and searched it.  There, he discovered not only evidence that Katie was indeed having an extramarital affair with Walker, but he also found images and a video of Katie performing oral sex on John Doe 3.  Darren called law enforcement and Katie was arrested.

Katie agreed to be interviewed following her arrest.  When questioned about the images of her sexually abusing John Doe 3, Katie admitted she created the images, but claimed they were solely for her personal viewing at a later date.  When pressed, Katie admitted to the extramarital affair with Walker, and said that Walker told her he was interested in young boys.  Katie said it was her idea, not Walker's, to create the images and send them to Walker for his sexual arousal.  Katie said she knew Walker downloaded the files, and that his Snapchat username was "Daddy D."  Law enforcement received a warrant and searched Katie's phone, during which they found numerous images of Katie sexually abusing John Does 1, 2, and 3, as well as evidence of her sending those images to Walker.

Following Katie's revelations, law enforcement received search warrants for Walker's person and residence. Officers arrested Walker at a restaurant in Minot and seized his cell phone. In a brief on-site review of the cell phone, officers located images of Katie sexually abusing her three children. Walker was arrested and charged with three counts of possession of prohibited materials in Ward County state court. A full search of Walker's phone revealed 19 thumbnails of images of Katie sexually abusing children.

After Walker was arrested, but before he had his initial appearance in state court, Katie requested a second interview with law enforcement. In this interview, Katie again took responsibility for sexually abusing her children, but now said that she only did this because Walker asked her to. She admitted her and Walker were romantically involved, and that he confessed to her that he is sexually attracted to young boys. She admitted that he requested images of her young children, which at first were just images of their nude genitals, but that he later he asked her perform sex acts on them. Katie also admitted to taking lascivious images of three other children she babysat and sending them to Walker at his request, and that on one occasion she traveled to Walker's residence, where the two of them jointly sexually abused John Doe 3. Katie was charged in North Dakota state court with five counts related to this conduct. See State of North Dakota v. Katie Heidinger, Case No. 25-2020-CR-00005 (McHenry County, filed Jan. 10, 2020).

Walker and Katie were indicted in federal court on February 5, 2020, after which the state charges against Walker were dismissed. The eight-count indictment charged them jointly with six counts of sexual exploitation of a child under 18 U.S.C. § 2251(b) for conduct against John Does 1, 2, 3, 4, and Jane Does 1 and 2. The indictment also charged Katie with one count of distribution of images depicting the sexual exploitation of children under 18 U.S.C. § 2252(a)(2), and Walker with

one count of receipt of images depicting the sexual exploitation of children under 18 U.S.C. § 2252(a)(2). Walker was arraigned on February 6, 2020, and detained pending trial. Walker was appointed Attorney Ashley Gulke as his counsel at his initial appearance. Approximately three months later, Attorney Gulke moved to withdraw from Walker's case and her motion was granted. Shortly thereafter, Attorney Ryan Sandberg was appointed to represent Walker.

On November 15, 2021, Walker filed a motion to suppress and a request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). On December 13, 2021, the Court denied the motion, finding any inconsistencies in the search warrant application were clerical errors, there was probable cause to support the warrant, and the *Leon* good faith exception would apply in any event. Walker would later raise the suppression issue on appeal, but the denial of the suppression motion was affirmed. See United States v. Walker, 68 F.4th 387, 391 (8th Cir. 2023).

Trial began on January 24, 2022. The Government's first witness was Darren Heidinger. Darren detailed how he learned of the offense conduct on January 7, 2020, after he took Katie's phone to search for evidence of her affair with Walker. In looking through Katie's phone, Darren found an image of her performing oral sex on John Doe 3, so he called law enforcement and showed them the image. Darren shared details of when he believed Katie and Walker first met and then laid foundation for Government exhibits that were photographs of the Heidinger household. Defense counsel briefly cross-examined Darren, focusing primarily on establishing that Katie was better with computers than Darren. Next, the Government called North Dakota Bureau of Criminal Investigations Special Agent Jesse Smith ("SA Smith"). After establishing his credentials, SA Smith detailed his analysis of the digital forensic evidence collected from Katie and Walker's phones. On Katie's phone, SA Smith found 543 still images and 11 videos of child pornography created by Katie. The Government

published a sampling of those images for the jury.  SA Smith also searched Katie's Snapchat application, where he located a number of sexually-explicit Snapchat messages sent from Walker to Katie that referenced one of Katie's minor children, John Doe 1, by name.  SA Smith then testified that in the background of the photos and videos he could identify distinctive items that law enforcement photographed during the search of Walker's home.  On Walker's phone, SA Smith testified he found 19 images of child pornography, and that those images matched images he found on Katie's phone.  The Government published a sampling of those images for the jury.  SA Smith then detailed his process for creating the 90-page exhibit that displayed the Snapchat message history between Walker and Katie.  See Doc. No. 217.  SA Smith noted that because of Snapchat's retention policies, message content was only viewable from page 74 onward.  Finally, SA Smith stated that based on his review of the digital evidence, he estimated the offense conduct occurred between August 24, 2019, and January 6, 2020.

On cross-examination, defense counsel clarified with SA Smith that the images on Walker's phone were thumbnails, and not full-size images.  SA Smith testified that a thumbnail might be created on someone's device even if the user does not click on a full-size image, and that all he found on Walker's phone were thumbnails.  Defense counsel then asked whether the information from Snapchat could determine whether or not Walker opened any of the messages.  SA Smith stated he could not say for sure based on the information presented at trial.  On redirect, the Government followed up on defense counsel's final point, and SA Smith testified that the presence of the sexually-explicit thumbnails on the device led him to believe Walker did actually open the Snapchat messages from Katie.  On recross-examination, SA Smith added that Snapchat message content is hidden until the user clicks the message to view its contents.

Katie was the final witness for the Government.  After introducing herself and giving the background of her guilty plea and agreement to testify, Katie testified that she first met Walker around August of 2019, and they communicated first through text messages and then through Snapchat.  A month later, the relationship became a sexual, extramarital affair.  Around that same time, Walker confessed to Katie that he was sexually attracted to children, and that he wanted Katie to take sexually explicit images of her children and send them to him.  At first, Walker asked Katie to send him photographs of her sons' genitals, and Katie did this to make Walker happy.  This escalated to Walker asking Katie to send him recordings of her sexually abusing her children, which she also did.  When Walker found out Katie had access to other children through babysitting, he asked for sexually explicit images of those children as well.  Katie then detailed her sexual exploitation of John Doe 4 and Jane Does 1 and 2.  In total, Katie estimated she sent approximately 500 sexually-exploitative images and videos to Walker at his request.

Next, Katie testified to the extent of her physical relationship with Walker.  She testified that not only did she and Walker have a sexual relationship, but Walker wanted to involve her children in their sex acts.  Katie testified she brought John Doe 3 with her to one of her sexual encounters with Walker, during which both she and Walker performed oral sex on John Doe 3.  Katie recorded this incident on Walker's phone at his request.  The Government introduced and published an image of Katie performing oral sex on Walker, which she testified was taken during the sexual encounter where they jointly sexually abused John Doe 3, and she confirmed that John Doe 3's foot is visible in the corner of the image.

Next, the Government presented a series of images Walker sent to Katie on Snapchat.  Katie testified it was normal for Walker to send her images of his penis.  On some of the images, Walker

superimposed a banner with the message.  In the first image discussed, Walker sent an image of his nude erect penis with the banner, "Damn just looked at vids. The love you have for them."  See T.T.[1] p. 200.   Katie stated she received this message from Walker shortly after she sent him a sexually-exploitative video of one of the victims.  In five of the images presented to the jury, Walker explicitly referenced John Doe 1 by name.  In one such image, Walker sent Katie a close-up image of his nude erect penis with the banner "Hey [John Doe 1] want to help me pee."  See T.T. p. 201. Walker sent another two images after receiving a video from Katie of John Doe 1 rubbing his penis. In one, Walker sent a close-up image of his nude erect penis with the banner, "[John Doe 1] rub mine too." See T.T. pp. 202-03.  In another, Walker sent a close-up image of his genitals bulging through his underwear with the banner, "My dick needs attention from you and [John Doe 1]."  See T.T. p. 203.  In two others, Walker sent close-up images of his nude erect penis with the captions, "Tell [John Doe 1] I'm watching porn" and "For [John Doe 1]."  See T.T. pp. 203-04.  In the final such image presented at trial, Walker sent a close-up image of his nude erect penis with the banner, "Laying here trying to sleep. my dick thinking about today."  See T.T. p. 205.  Katie testified this message was sent just after she and Walker had jointly sexually abused John Doe 3.

Next, the Government went through some of Katie and Walker's Snapchat messages.  Katie confirmed the Snapchat username "single_gaboy" belonged to Walker.  In discussing a conversation where Katie attempted to arrange a sexual tryst with Walker, the Government presented an exhibit that showed Katie offering "Uninterrupted sex[,][2] sucking dick and licking my pussy…", to which

---

[1]The trial transcript ("T.T.") can be found at Doc. Nos. 172-74.

[2]SA Smith testified the "%2C" symbol in the Snapchat message in Doc. No. 217 is computer code for a comma.  T.T. pp. 177-78.  Commas within brackets are used herein for ease of reading.

Walker responded with "Mmm," and then, "And how many dicks we talkinf? [sic]." See Doc. No. 217, p. 82. Katie took the latter message to mean that Walker wanted her to bring her male children with her to the rendezvous, even though she did not. Walker's final message to Katie, sent the day she was arrested, read:

> So why you cutting the boys out now? I said I'm in this for all of you. I don't see anything with u and [John Doe 1] lately. Like ur totally not showing him any attention lately I know[,]got to continue that or he will eventually lose interest. Idk[,] just seems like u forget a big part of what i love about u[,] the loving pedo mom part. Idk

See Doc. No. 217, p. 90. Katie testified that prior to receiving this message she told Walker she wanted to leave the relationship and she had not recently sent him any videos of John Doe 1. She also testified Walker had called her a "pedo mom" since the beginning of their sexual relationship. The Government closed out Katie's direct examination with a brief discussion of her interviews with law enforcement, wherein she admitted she lied in her first interview. The Government then played a slideshow of the sexually-exploitative images created by Katie for Walker during which Katie identified images of all six of the minor victims as charged in Counts One through Six. Finally, Katie ended her direct examination by stating that she felt disgusted with her conduct.

Defense counsel cross-examined Katie extensively on a number of topics. First, he questioned Katie on her first interview with law enforcement. Defense counsel highlighted that Katie was reminded to tell the truth at the start of that interview, and that she was given multiple opportunities to implicate Walker and never did. Next, defense counsel focused on a series of fourteen Snapchat messages Katie sent to Walker the day she was arrested, all of which went unanswered by Walker. Defense counsel ended that line of inquiry by asking, "Is it fair to say you were infatuated with him?" to which Katie said, "At the time, yes." See T.T. p. 235. He then established that Katie knew how

9

to add captions to images.  Next, defense counsel pointed out for the jury that the video Katie recorded of Walker sexually abusing John Doe 3 was never located.  Defense counsel then briefly questioned Katie on her mental health.  Finally, defense counsel questioned Katie on the terms of her plea agreement, where he noted she was receiving a significant break from the maximum sentence (if sentenced consecutively) by cooperating with the Government.  The Government briefly redirected on those topics followed by a brief re-cross-examination.  The Government rested after Katie's testimony.

Outside the presence of the jury, defense counsel moved for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on Counts Five and Six (related to Jane Does 1 and 2).  The Government resisted, and the Court denied the motion.  Court briefly reconvened, and the defense rested without calling any witnesses.  The next day, January 26, 2022, the jury returned and heard closing arguments from both parties.  After approximately three hours, the jury returned guilty verdicts on all seven counts against Walker.

Walker appealed his conviction on three grounds.  First, Walker challenged whether it was error to deny the motion to suppress and a *Franks* hearing.  United States v. Walker, 68 F.4th 387, 390-91 (8th Cir. 2023).  Second, Walker challenged whether the District Court abused its discretion in excluding a video of Darren Heidinger dancing nude in his living room.  Last, Walker challenged whether there was an error in the jury instruction for aiding and abetting.  The Eighth Circuit Court of Appeals found no error on any issue and affirmed the conviction.  Id. at 393.

10

II.    **STANDARD OF REVIEW**

28 U.S.C. § 2255 provides a federal prisoner an avenue for relief upon a showing that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose such sentence; (3) the sentence exceeded the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a); see King v. United States, 595 F.3d 844, 852 (8th Cir. 2010). This requires a showing of either constitutional or jurisdictional error, or a "fundamental defect" resulting in a "complete miscarriage of justice." Davis v. United States, 417 U.S. 333, 346 (1974); Hill v. United States, 368 U.S. 424, 428 (1962). A 28 U.S.C. § 2255 motion is not a substitute for a direct appeal and is not the proper way to complain about simple trial errors. Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). A 28 U.S.C. § 2255 movant "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). Section 2255 is "intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." Davis, 417 U.S. at 343. Section 2255 is also not an opportunity to relitigate issues that were argued and rejected on direct appeal. United States v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981) ("It is well-settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255."); see Bear Stops v. United States, 339 F.3d 777, 780 (8th Cir. 2003).

A prisoner is entitled to an evidentiary hearing on a Section 2255 motion unless the motion, files, and records of the case conclusively show that the prisoner is not entitled to relief. 28 U.S.C. § 2255; Engelson v. United States, 86 F.3d 238, 240 (1995). A Section 2255 motion "may be dismissed without hearing if (1) movant's allegation, accepted as true, would not entitle the petitioner to relief, or (2) [the] allegations cannot be accepted as true because they are contradicted by the

record, are inherently incredible, or are conclusions rather than statements of fact." See Winters v. United States, 716 F.3d 1098 (2013); see also Holloway v. United States, 960 F.2d 1348, 1358 (8th Cir. 1992) (a single, self-serving, self-contradicting statement is insufficient to render the motions, files and records of the case inconclusive); Smith v. United States, 618 F.2d 507, 510 (8th Cir. 1980) (mere statement of unsupported conclusions will not suffice to command a hearing).

### III.    LEGAL DISCUSSION

Walker raises six primary claims for relief along with numerous subclaims. In each claim he alleges ineffective assistance of counsel. The Court will address each claim in turn.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. To be eligible for habeas relief based on ineffective assistance of counsel, a defendant must satisfy the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, a defendant must establish that defense counsel's representation was constitutionally deficient, which requires a showing that counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. This requires showing that counsel made errors so serious that defense counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687-88. In considering whether this showing has been accomplished, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. If the underlying claim (i.e., the alleged deficient performance) would have been rejected, defense counsel's performance is not deficient. Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996). Courts seek to "eliminate the distorting effects of hindsight" by examining defense counsel's performance from counsel's perspective at the time of the alleged error. Id.

Second, it must be demonstrated that defense counsel's performance prejudiced the defense. Strickland, 466 U.S. at 687. In other words, under this second prong, it must be proven that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Wiggins v. Smith, 539 U.S. 510, 534 (2003). An increased prison term may constitute prejudice under the *Strickland* standard. Glover v. United States, 531 U.S. 198, 203 (2001).

There is a strong presumption that defense counsel provided "adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690; Vogt v. United States, 88 F.3d 587, 592 (8th Cir. 1996). A court reviewing defense counsel's performance must make every effort to eliminate hindsight and second-guessing. Strickland, 466 U.S. at 689; Schumacher v. Hopkins, 83 F.3d 1034, 1036-37 (8th Cir. 1996). Under the *Strickland* standard, strategic decisions that are made after a thorough investigation of both the law and facts regarding plausible options are virtually unchallengeable. Strickland, 466 U.S. at 690. Strategic decisions and trial strategy are generally entrusted to defense counsel as a matter of professional discretion. United States v. Orr, 636 F.3d 944, 952 (8th Cir. 2011). When the defendant asserts that there are multiple deficiencies, each claim is reviewed independently. Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006). There is no "cumulative error" rule applied to assistance of counsel claims. United States v. Robinson, 301 F.3d 923, 925 n.3 (8th Cir. 2002).

## A.    CLAIM ONE

Walker's first claim of ineffective assistance relates to the pretrial review of discovery. Walker contends defense counsel failed to adequately meet with him and confer prior to trial. Walker

also contends defense counsel failed to adequately review discovery with him and this led to the adoption of an ineffective trial strategy which ultimately failed.  Walker, who maintains his innocence, points to twelve specific pieces of evidence he contends defense counsel should have utilized to cast doubt on the Government's case.

Walker's contention that defense counsel failed to meet with him, go over discovery, and develop an agreed upon trial strategy is rebutted by defense counsel's affidavit.  Walker asserts he only met with defense counsel four times and went over discovery on two of those occasions.  However, in defense counsels affidavit he states he met with Walker in-person ten times, and that he spoke with Walker on the phone eighteen times.  See Doc. No. 209-1, ¶¶ 1-4.  Defense counsel goes on to note they discussed discovery during eight of the in-person meetings, and on twelve of the phone calls.  Defense counsel further states in his affidavit that he discussed discovery with Walker on twenty occasions in total.

Defense counsel also described his discovery review process with Walker.  He states he would "bring the discovery to the client, or I would go over my notes about the discovery with the client.  Or I would call him and discuss in detail the discovery."  See Doc. No. 209-1, ¶ 4.  Defense counsel also affirmed that he personally reviewed the entire discovery file and that the stipulated discovery order prevented him from leaving the discovery with his client.  See Doc. No. 209-1, ¶¶ 3 and 5.

The record establishes that defense counsel reviewed the entire discovery file and that he fully complied with his duty to consult with Walker by discussing discovery with him on twenty occasions prior to trial.  This performance was reasonable.

Walker's contentions regarding the twelve listed items also fail.  Walker contends these twelve items would have raised substantial doubt in the minds of the jury.  However, his estimation of the

effect of these twelve items is speculative and improbable.  Walker focuses on the twelve items in a vacuum, overlooking the Government's case and the compelling testimony from Katie Heidinger. The twelve items, which the Court will discuss below, are unimpressive when considered in conjunction with the entire body of evidence presented at trial.

###### 1.      **Example 1**

The first example Walker points to is a Snapchat message from Katie Heidinger to Walker stating "Please unblock me, this makes me sad."  Walker contends this message supports his contention that he was trying to end the affair.  The message itself is not in the record and thus it is unknown when it was sent.  The defense theory at trial was to make this case about Katie and her alone, not that Walker was trying to end his relationship with Katie.  See Doc. No. 209, ¶ 10.

The trial involved hundreds of Snapchat messages sent between Walker and Katie.  See T.T. pp. 165-66; Doc. No. 217 (Trial Exhibit 31).  In cross-examining Katie, defense counsel spent considerable time focusing on fourteen Snapchat messages Katie sent Walker on January 7, 2020, the day she was arrested, that went unanswered.  See T.T. pp. 230-35.  Defense counsel went over each of these unanswered messages with Katie, which included messages that stated "Fine ignore me" and "Damn you."  See Doc. No. 217, pp. 87- 89.  Defense counsel focused on the fact that the messages from Katie became increasingly hostile, and then asked, "Is it fair to say you were infatuated with him?" to which Katie answered, "At the time, yes."  See T.T. p. 235.  Defense counsel followed up with additional questions to further emphasize the infatuation.  See T.T. p. 235.  In his closing argument, defense counsel characterized Katie as hopelessly infatuated with Walker, despite the fact that Walker frequently ignored her.  See T.T. pp. 285-87.  Viewed in relation to the other evidence

15

presented at trial, the message—"Please unblock me, this makes me sad"—would not have presented any new information to the jury.

In addition, the final Snapchat message Walker sent to Katie directly contradicts his theory that he was attempting to end the affair. That message reads as follows:

> So why you cutting the boys out now? I said I'm in this for all of you. I don't see anything with u and [John Doe 1] lately. Like ur totally not showing him any attention lately I know[,]got to continue that or he will eventually lose interest. Idk[,] just seems like u forget a big part of what i love about u[,] the loving pedo mom part. Idk

See Doc. No. 217, p. 90. The first line of the message ("So why you cutting the boys out now?") combined with the last line ("Idk[,] just seems like u forget a big part of what i love about u[,] the loving pedo mom part.") indicates Walker was not trying to walk away from the relationship or the offense conduct. The middle portion of the message ("Like ur totally not showing him any attention lately") shows Walker was not only encouraging Katie to continue abusing John Doe 1, but it appears Walker did so with knowledge from past experience sexually abusing minors ("I know[,] got to continue that or he will eventually lose interest."). In his motion, Walker admits these were his words. See Doc. No. 195, p. 22. The Court concludes one more message showing Walker did not always answer Katie's messages would not have changed the outcome at trial. Not submitting this additional message to the jury was reasonable trial strategy. Walker has failed to demonstrate deficient performance or prejudice in relation to this message.

### 2. Examples 2, 3, 4, 7 & 8

Five of Walker's examples are reports created by forensic interviewer Shannon Hilfer following the forensic interviews of John Does 1, 2, and 4, and two minor victims from another uncharged matter. Walker claims defense counsel should have either entered these reports as exhibits,

16

or called the children or the forensic interviewer to testify about the content of the interviews. Walker claims he was prejudiced because the jury should have heard that none of the children disclosed during their forensic interviews that Walker sexually abused or acted inappropriately toward them. However, this evidence was inadmissible for a number of reasons including that much of it was hearsay, irrelevant, and cumulative. Even if the information contained in the reports was admitted at trial, it would have provided no new information to the jury.

Walker's contention that testimony from these minor victims would have helped his case is deeply flawed because Walker was never accused of committing hands-on sexual abuse against any of these victims. Each of Walker's six sexual exploitation charges contained language charging both the completed offense and aiding and abetting. See Doc. No. 2. Katie testified extensively about the offense conduct, which consisted of Walker requesting images and videos of her performing sexual acts on children and taking photographs of children's genitals. See T.T. pp. 192-94. Katie testified that she and Walker committed hands-on sexual abuse against John Doe 3 together and recorded it, but not against any of the other victims. See T.T. p. 195. The video was never located. See T.T. p. 238. John Doe 3 was one-year-old and thus was not forensically interviewed. Aside from the testimony regarding John Doe 3, the United States presented no other evidence that Walker committed hands-on sexual abuse against any other victim, including the five victims in Hilfer's reports. Three of these victims were sexually abused by Katie at the request of Walker, and Walker was convicted of aiding and abetting that abuse. But at no time during trial was Walker himself accused of sexually abusing any of the five victims. Having the minor victims testify to that fact would not have presented new evidence to the jury. The jury was well aware of the charges against Walker and what the evidence presented by the Government indicated he had done. Defense counsel

17

did not err by failing to introduce Hilfer's reports and Walker suffered no prejudice by the non-use of the evidence.

### 3.   **Example 5**

Walker's fifth example is his assertion that defense counsel should have called Katie's friend, Katie Labrecque ("Labrecque"), to testify that a year prior to the charged offense conduct, Katie's oldest child (John Doe 1) walked in on Lebrecque's child (John Doe 4) in the shower and kissed him. Walker contends this kissing narrative is "disturbing," and that it could have led to additional inquiry into other behaviors of John Doe 1 or activities within the Heidinger household.   Walker also contends a video of Darren Heidinger dancing in his home should have been introduced.   The Court fails to see how this seemingly irrelevant and remote in time evidence could have helped Walker's case.

The theory behind the Government's case was that Heidinger photographed herself sexually exploiting children at the behest of Walker, and she then shared those photos with Walker.   Katie testified at trial about the details of the sex acts both she and Walker performed upon her children, as well as the detailed requests she received from Walker.   See T.T. pp. 190-96.   At no time did Katie minimize her participation in the offense conduct besides admitting she felt "disgusted" with her conduct.   See T.T. pp. 224-25.   This narrative about a young child kissing another young child a year prior to the offense conduct would not have helped Walker's case, as the jury heard ample evidence of the far-more disturbing acts that Katie committed at the request of Walker and for his gratification.

Walker ignores the disturbing evidence the jury heard about his role directing and participating in the offense conduct.   Katie testified that she only took the sexually explicit images of the child victims at Walker's request to make him happy, and that Walker admitted early in their affair that he

was sexually attracted to young children.  See T.T. pp. 190-91.  Katie also testified about the sexual abuse they both committed against John Doe 3.  See T.T. pp. 195-96.  She later went on to testify that Walker's sexual attraction became focused on John Doe 1—the same child who allegedly kissed John Doe 4 a year before the offense conduct.  See T.T. pp. 203-04.  Katie's testimony painted Walker as an active participant in the sexual abuse, even if he was not the one physically performing the abusive acts.  The Government also introduced numerous Snapchat photo messages Walker sent to Katie wherein super-imposed messages expressing his sexual desire for John Doe 1 over the top of photographs of his nude, erect penis and his groin area.  See T.T. pp. 203-05.

The kissing narrative between two of the victims does nothing to cast doubt on Katie's testimony.  The video of Darren Heidinger that Walker focuses on was ruled inadmissible and this ruling was affirmed by the Eighth Circuit Court of Appeals.  See Walker, 68 F.4th at 392.  It is inconceivable that a story about John Doe 1 kissing another child a year prior to the offense conduct would have had any effect on the jury's verdict.  Defense counsel was not ineffective for failing to introduce, or attempt to introduce, this evidence and Walker has failed to demonstrate prejudice.

### 4.      **Example 6**

Walker contends defense counsel should have called Katrina Huston to testify as a defense witness.  Walker claims that calling Huston to the stand and impeaching her credibility would have cast doubt on the investigation into his conduct.  Walker also claims Huston could have impeached Katie's credibility.

However, Huston would not have been a favorable witness for the defense.  Huston did not testify at trial.  Her name was not mentioned in front of the jury.  Had Huston been called, her testimony would have inculpated Walker in additional criminal conduct of the same nature.

Huston was listed as a Government witness, but ultimately the Government did not call her to testify.  Two months prior to trial, the Government filed notice that Huston would be called to provide testimony of Walker's past, similar acts ("Rule 414 testimony").  See Doc. No. 89.  In its notice, the Government asserted that Huston would testify about a criminal scheme that was substantially-similar to the offense conduct; namely, that Walker pressured Huston to take images of her sexually abusing her minor daughters and to send them to him.  Huston would have testified that she sent approximately ten such images to Walker.  The Government also asserted that Huston participated in a three-way Snapchat conversation with Katie and Walker, and that Huston observed Katie sending images of her sexually abusing her children to the group.  A week prior to trial, Huston was again noticed as a Government witness.  See Doc. No. 123.  However, the Government rested its case without calling Huston.  At no point in the trial did any witness mention Huston or the conduct involving her and Walker in front of the jury.  The details of the conduct between Walker and Huston, and the similarities to that between Walker and Katie are such that it would have been disastrous for Walker to call Huston as a witness.

About five months after Katie and Walker were arrested, Huston was charged in state court with gross sexual imposition.  See Doc. Nos. 209-3 and 209-4.  The affidavit of probable cause in that case contains a number of similarities to the federal case against Walker and Katie.  See Doc. No. 209-6.  Huston's conduct was discovered in the course of investigating the conduct between Katie and Walker.  In interviews with Special Agent Trudell, who was also the lead agent in Walker's case,

Huston stated that Walker repeatedly asked her to take nude images of her minor daughters (ages 12 and 14) and to send them to him.  Huston resisted at first, but she eventually gave in to Walker's relentless pressure.  Huston then sent Walker a few videos of her touching her minor daughters while they slept for Walker's sexual gratification.  Walker then asked if he could have sex with her minor daughters, after which Huston ended their relationship.  Huston later participated in a Snapchat group chat where she observed Katie and Walker sharing images of child pornography.  Huston pled guilty to the state charges.  As a condition of the plea, Huston was required to cooperate with the federal case pending against Walker and Katie.  It seems rather obvious to the Court that had the jury heard this narrative it would have only further convinced them that Walker was guilty.

Defense counsel was well-aware of the Walker-Huston conduct, which he notes included allegations of additional sexual misconduct against his client.  See Doc. No. 209-1,  ¶ 10.  Shortly after receiving the Government's Rule 414 Notice, defense counsel filed a motion in limine seeking to exclude evidence of the three-way Snapchat conversation between Walker, Katie, and Huston.  See Doc. No. 94.  Defense counsel also filed an objection to the Rule 414 Notice itself, in which he notes a number of objections to testimony from Huston, including relevance and Federal Rule of Evidence Rule 403.  See Doc. No. 97.  Thus, Defense counsel was fully and properly aware of the damage that Huston's testimony would have done to Walker, and he took all reasonable steps to avoid it.  Had defense counsel not done so, that failure may very well have amounted to ineffectiveness assistance. There is no evidence the decision by defense counsel not to call Huston and to try to keep her from testifying was anything other than sound legal strategy.  No competent defense attorney would have called Huston as a defense witness.  Walker's protestations to the contrary are unpersuasive to say the least.

### 5.      Examples 9 and 10

Walker next cites two photographs as examples, both of which relate to substance use. Although not part of the record, the parties agree one  is a photograph of an empty whiskey bottle, and the other is a photograph of a marijuana smoking device.  Both were apparently found in Walker's home.  He contends these photos should have led defense counsel to pursue a voluntary intoxication instruction and/or defense.  However, defense counsel states he did not believe such a defense was viable.  See Doc. No. 209-1, ¶ 8.  As the Court will further explain in relation to Claim Three, the facts of the case did not warrant a voluntary intoxication instruction, largely because the offense conduct occurred on many occasions over a five month period.

### 6.      Example 11

Walker contends defense counsel should have introduced at trial a Homeland Security Report of Investigation generated after Katie gave a proffer interview.  Walker argues that defense counsel should have used that information to impeach Katie's testimony.  Walker claims this report, which is not in the record, shows Katie made perjured statements, and that by not seeing this report until after the trial, he was not able to give additional investigative instruction to private investigator Abbey.

Walker's contention fails for several reasons.  First, he failed to file the report, so the Court cannot review it and thus he cannot meet his burden of demonstrating deficient performance and prejudice.  Second, fails to identify what investigative steps he would have recommended based on the report.  Third, defense counsel states in his affidavit that he reviewed the entire discovery file prior to trial so there is no reason to believe he did not properly consider this report in deciding on a defense strategy or preparing Walker's defense.  See Doc. No. 209-1, ¶ 3.  Fourth, the report is likely

22

inadmissible hearsay.  Therefore, Walker has failed to demonstrate defense counsel was ineffective in failing to introduce the report.

### 7.    Example 12

In his final example, Walker claims defense counsel should have introduced seven additional Snapchat messages.  The messages themselves do not appear to be in the record.  Walker states they consist of the following:

Snap Chat: From Katie Heidinger to Katrina Huston: (09/11/19 - 09/26/19)

1) 09/11/19 @ 0l:09, Katrina Huston stating: (Shes had sex with boys 14 & 16);

2) 09/11/19 @ 01:12, Katie H. stating: (She pleases her 1 year old boy);

3) 09/11/19 @ 01:13, Katrina responding: (That's hot);

4) 09/23/19 @ 02:55, Katrina states: (Kenny, her oldest daughter likes to watch lesbian porn).

5) 09/24/19 @ 00:34, Katie states: ([her] kid is lifting her shirt to play with her tits.)

6) 09/24/19 @ 00:35, Katie states: (Maybe he will play with this too.)

7) 09/24/19 @ 00:40, Katie states; (Best way they will learn).

See Doc. No. 195, p. 13.  Four of these messages were sent by Katie, three by Huston, and the recipient is unclear.  All the messages were sent within a two-week time period that coincides with the offense conduct.  Walker claims these messages were mitigating evidence that could have shown he did not have the proper *mens rea* for conviction.

However, these messages would have provided no new information to the jury and do not help Walker's case.  The messages reveal Katie sexually abused her one-year-old child, John Doe 3, but,

Katie admitted to that on the stand and pled guilty prior to Walker's trial. See T.T., p. 195-96. Katie testified she only sexually exploited children because Walker told her to do it. The more evidence of Katie's sexual exploitation under these facts would have only meant more evidence of Walker's intention for her to commit the sexual exploitation.

As for Walker's *mens rea*, there was ample evidence presented at trial to support the guilty verdict. Katie testified that Walker told her he was sexually attracted to children. See T.T. p. 190. Katie also testified she only began sexually exploiting her children and recording it at the behest of Walker to make him happy. See T.T. pp. 190-91. She also testified as to an incident where she and Walker jointly sexually abused John Doe 3 and recorded it. See T.T. pp. 195-96. The Government introduced five explicit Snapchat messages where Walker expressed his sexual desire for John Doe 1. There is also Walker's final Snapchat message to Katie, where he implores her to continue abusing John Doe 1, and he calls her a "loving pedo mom." See Doc. No. 217, p. 90. Considered alongside the evidence at trial, these additional Snapchat messages would have only confirmed what the jury already knew—that Katie sexually abused her children. The messages would not have helped Walker or in any way negated his *mens rea*. Defense counsel was not ineffective in choosing not to introduce these additional Snapchat messages and Walker has not demonstrated how the choice prejudiced him.

### B.    CLAIM TWO

Walker's second claim of ineffective assistance of counsel is that defense counsel was ineffective for failing to call expert witnesses to aid in his defense. Walker lists six potential expert witnesses in his motion and supplement but offers nothing more than speculation as to how these witnesses could have helped his case.

### 1.      Witnesses 1 & 2: Carrie Abbey and Shannon Hilfer

The first two potential experts are private investigator Carrie Abbey and forensic interviewer Shannon Hilfer.  Abbey worked on Walker's case for a brief period of time prior to defense counsel Sandberg taking over the representation.  Walker claims Abbey would have presented expert testimony about her investigation of Katrina Huston, including testimony that Huston gave inconsistent statements.  Though both these witnesses have specialized training that guided their work on this case, none of the testimony Walker would have garnered from them would have been 'expert' testimony under the Federal Rules of Evidence.  Rather, they could only have been called to offer lay fact testimony.

Regarding Abbey, Walker focuses on Katrina Huston.  However, Huston did not testify at trial.  Walker suggests defense counsel should have called Abbey to testify about Huston's out-of-court, inconsistent statements.  Walker claims Huston changed her story about whether he asked to have sex with one of her minor daughters, and that there was evidence it was actually Huston's boyfriend who was making sexually inappropriate comments to her two daughters.  But, Walker was not on trial for any of that conduct, and Huston's minor daughters were not victims in the current matter.  Such testimony would have been hearsay and irrelevant because Huston did not testify.  The Court can discern no error or prejudice from the decision of defense counsel not to call Abbey.

Hilfer is the certified forensic interviewer who conducted forensic interviews with three of the minor victims in this matter, and two minor victims in an unrelated matter.  Walker claims it would have helped his case to have Hilfer testify that these five minors did not disclose any hands on sexual abuse by Walker.  However, such testimony would have been inadmissible hearsay.

In addition, the jury was already aware Walker was charged with aiding and abetting Katie's abuse of the children.  The victims at issue here are John Does 1, 2, and 4.  The testimony at trial showed that it was Katie, not Walker, who created and sent the sexually-exploitative images of these children.  See, T.T. pp. 191-94.  There was never any allegation Walker himself sexually abused John Does 1, 2, or 4 and the other two victims were not mentioned at trial because Huston did not testify.  The evidence presented to the jury clearly established Katie was the principle, and Walker was the aider and abettor.  The information Walker contends Hilfer could have testified to does not address the theory of liability under which Walker was convicted.  The Court concludes defense counsel did not err, and Walker was not prejudiced by, the decision of defense counsel not to call Hilfer to testify.

### 2.    Witnesses 3, 4, and 5: Known and Unknown Medical Professionals

The next three witnesses Walker contends defense counsel should have called are known and unknown medical professionals (two doctors and a psychiatrist who treated Walker at some point prior to his arrest in this case).  Walker claims these experts could have testified how his mental capacity was affected by the combination of Attention-Deficit/Hyperactivity Disorder ("ADHD"), alcoholism, and substance abuse.  But as the Court will fully explain in Claim Three, the presentation of an intoxication defense was not reasonably available on the facts of this case.  Walker provides no evidentiary support for his speculative contention that the testimony of these medical professionals would have been helpful to him.  Walker offers nothing but speculation to support his contention and in so doing he has failed to demonstrate deficient performance and prejudice.

### 3.      Witness 6: Computer Forensic Expert

Finally, Walker contends defense counsel should have called a computer forensic expert to testify that Walker did not open any of the Snapchat messages containing child pornography sent to him by Katie. Walker also claims the computer forensic expert could have testified that Walker never solicited any child pornography from Katie or searched for child pornography online. Walker alleges that a forensic expert hired by his first attorney could have testified to these facts, but that when Ryan Sandberg took over as defense counsel he did not continue the investigation.

Walker is incorrect to claim defense counsel discontinued this line of investigation. Defense counsel hired Dan Meinke as a digital forensic expert. See Doc. No. 209-1, ¶ 6. Meinke examined Walker's "phones and computer, Snapchat evidence received from the US, and Derrick's Snapchat account." Id. Defense counsel "worked closely with Dan [Meinke] to help explain the digital evidence," and he took steps to ensure all the digital evidence got to Meinke at his facility in Sioux Falls, South Dakota. Id. Defense counsel spoke with Meinke "numerous times" about his findings prior to trial. Id. Ultimately, defense counsel decided not to call Meinke to testify at trial. During cross-examination of the Government's digital forensic analyst, SA Smith, defense counsel explored the issue of whether the digital forensic evidence showed Walker actually viewed the Snapchats sent from Katie, or whether it showed they were merely received but left unopened. SAt Smith testified he believed the images had been opened although there was some room for interpretation. See T.T. pp. 174-77. Both sides addressed the issue during closing arguments.

The Court concludes defense counsel reasonably investigated and reviewed the digital forensic evidence with Meinke. After that review, defense counsel decided that presenting Meinke's findings would not be helpful to Walker's case. Walker has not submitted anything other than speculation that

this decision was improper.  Consequently, the Court concludes Walker has failed to demonstrate both deficient performance and prejudice on this claim.

### C.      CLAIM THREE

In his third claim of ineffective assistance of counsel, Walker contends defense counsel failed to investigate issues of mental illness, drug abuse, and alcoholism, and that he was prejudiced because he had a valid intoxication defense based upon these issues.  Walker claims that an expert could have testified he acted under diminished capacity due to a combination of voluntary intoxication and mental illness that rendered him incapable of forming the requisite intent.  However, defense counsel did not believe the facts of the case made an intoxication defense viable.  See Doc. No. 209-1, ¶ 8. Walker offers little more than speculation and conjecture to support his contention.  The evidence presented at trial made only a few references to the consumption of alcohol by Walker.  Walker also fails to explain how his ADHD diagnosis would have supported a request for an intoxication instruction.

Defendants are generally entitled to instruct the jury "as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  Mathews v. United States, 485 U.S. 58, 63 (1988).  Intoxication is a defense to specific intent crimes.  United States v. Kenyon, 481 F.3d 1054, 1070 (8th Cir. 2007).  Walker was convicted of six counts of aiding and abetting the sexual exploitation of a child in violation of 18 U.S.C. § 2251(a).  See 18 U.S.C. § 2 (establishing that aiders and abettors are punishable as principles); see also  United States v. Fortier, 956 F.3d 563, 567 (8th Cir. 2020) (finding that 18 U.S.C. § 2251(a) is a specific intent crime).

The Eighth Circuit pattern jury instruction for the intoxication defense states as follows:

28

One of the issues in this case is whether the defendant was [intoxicated] [taking a drug or drugs] at the time the acts charged in the Indictment were committed.

Being under the influence of [alcohol] [a drug], [even one taken for medical purposes,] provides a legal excuse for the commission of a crime only if the effect of the [alcohol] [drug] makes it impossible for the defendant to have (insert mental state required by statute.) Evidence that the defendant acted while under the influence of [alcohol] [a drug] [drugs] may be considered by you, together with all the other evidence, in determining whether or not [he] [she] did in fact have (insert mental state required by statute.)

8th Cir. Model Crim. Jury Instr. 9.06 (2024).

An intoxication instruction should be given where sufficient evidence of intoxication is introduced. See United States v. Lavallie, 666 F.2d 1217, 1219 (8th Cir. 1981) (noting that an intoxication instruction should not be given "if it lacks evidentiary support or is based on mere speculation"). There must be evidence of the degree of intoxication, and that evidence must be sufficient to support a jury finding that the defendant completely lacked the ability to form the requisite intent. See United States v. Robertson, 606 F.3d 943, 956-57 (8th Cir. 2010) (superseded by rule on other grounds); see also United States v. Nacotee, 159 F.3d 1073, 1076 (7th Cir. 1999) ("To warrant a voluntary intoxication instruction, a defendant must produce some evidence she was drunk enough to completely lack the capacity to form the requisite intent."). Mere evidence the defendant had been drinking is not enough to warrant an intoxication instruction. Robertson, 606 F.3d at 956.

The charges against Walker involved offense conduct that occurred between May 2019 and January 2020, which is a nine-month window. See Doc. No. 2. At trial, Katie testified about first meeting Walker in August of 2019, the shift toward a sexual relationship, Walker confessing his sexual desire for children, and then Walker asking her to provide him with sexually explicit images

29

of her children.  See T.T. pp. 184-97.  Katie testified she took approximately 500 images for Walker over a five-month period between August of 2019 and January of 2020.  See T.T. p. 192.  At no point in her testimony did Katie mention Walker consuming alcohol or controlled substances.

The only mention of alcohol use at trial was contained in two Snapchat messages between Katie and Walker, and it was within the messages just preceding those discussed during Katie's testimony.  See Doc. No. 217, p. 81.  Those two messages—Walker mentioning "free booze" at a party, and Katie saying she would "bring beer" to their sexual tryst—were the entirety of the evidence regarding alcohol use presented to the jury.  Id.  Neither of the messages mentioned anyone actually consuming alcohol or being intoxicated, nor was there any mention of any offense conduct occurring on this occasion.  This evidence is insufficient to warrant an intoxication defense instruction.

Katie testified the offense conduct occurred on multiple dates over a five-month period.  In order for the Court to give an intoxication instruction, Walker would have needed to show that he was so intoxicated during each act of offense conduct that he was incapable of forming criminal intent.  Walker has presented no such evidence.

In his affidavit, defense counsel states that based upon his communications with Walker, an intoxication defense was not a viable option.  See Doc. No. 209-1, ¶ 8.  Walker himself denied having chemical dependency issues in his Presentence Investigation Report ("PSR") interview.  See Doc. No. 149, ¶ 114.  Walker provides little more that conclusory statements about his intoxication to support his argument that the defense should have pursued an intoxication instruction.  Walker also references images of a half-empty whiskey bottle and a marijuana pipe in his home.  However, these images are not part of the record, and even if accurate, do not provide sufficient evidence to warrant an intoxication instruction.

Walker also claims that his ADHD had an effect on his intoxication. However, the connection between ADHD and intoxication is unclear, and Walker provides no credible information on whether and how ADHD exacerbated his alleged intoxication. The record reveals Walker does suffer from ADHD. See Doc. No. 212-1. However, in the PSR interview Walker denied taking any medication to manage the symptoms. See Doc. No. 149, ¶ 111. The PSR also reveals that from 2018 to the time of his arrest in 2020, Walker worked as a conductor with the railroad in Minot. All these facts cast doubt on any claim about diminished capacity or mental acuity issues related to ADHD or intoxication. Walker's suggestion in his reply brief (Doc. No. 221, p. 90) that his diminished capacity argument only applies to the "pedo mom" message (Doc. No. 217, p. 90) he sent to Katie on January 8, 2020, does not save his argument as the Court would not give an intoxication instruction based upon one episode of drinking when the offense conduct spanned five months.

Walker has failed to demonstrate there is sufficient evidence he was intoxicated to an extreme degree during any act of offense conduct that would have warranted an intoxication instruction. Defense counsel was aware of the scant evidence of his substance use and his mental health diagnosis, and he made the reasonable decision not to pursue that defense. This claim fails for lack of demonstrated deficient performance and prejudice.

### D.    CLAIM FOUR

In his fourth claim of ineffective assistance of counsel, Walker raises multiple claims related to Katie and Huston. He first reiterates that defense counsel should have called Huston to rebut Katie's testimony. Next, he contends defense counsel should have read Katie's interview transcripts to the jury. Walker also makes a contradictory argument that defense counsel should have objected

31

to Katie's second interview under 18 U.S.C. § 3501 along with an interrelated argument regarding the voluntariness of her confession. Finally, Walker makes a sufficiency of the evidence argument related to his conviction for receipt of child pornography. None of the contentions are persuasive.

The Court has already addressed in Claim One why it would have been ill-advised for the defense to call Huston as a witness. Huston would not have been a favorable witness for the defense. Defense counsel cannot be faulted for failing to call her as a witness.

Walker also claims defense counsel should have objected to Katie's testimony under 18 U.S.C. § 3501. This contention fails for multiple reasons. First, in *Dickerson v. United States*, 530 U.S. 428, 442-43 (2000) the United States Supreme Court held 18 U.S.C. § 3501 is unconstitutional to the extent it conflicts with the constitutional mandate of *Miranda v. Arizona*, 384 U.S. 436 (1966). Second, Katie testified at trial. Outside of her testimony, the Government offered no evidence of her interviews with law enforcement. So, the Government did not actually use Katie's second interview against Walker at trial. Further, the circumstances of the second interview weigh heavily against any finding of involuntariness because it was Katie herself who requested the second interview. See T.T. pp. 221-22. In addition, prior to testifying, Katie signed a plea agreement admitting to the conduct she confessed to in the interview . See Doc. No. 35. As part of that plea agreement she agreed to cooperate in the prosecution of Walker. See Doc. No. 36. She also pled guilty on the record in open court prior to Walker's trial. See Doc. No. 47. Walker provides no evidence to counter these facts and no evidence to support his speculative assertion that Katie was coerced into implicating him.

Defense counsel fully addressed the issue of why Katie implicated Walker in her second interview and not her first interview. In his cross-examination of Katie, defense counsel extensively probed Katie on her motivation for changing her story between her first and second interviews. T.T.

32

pp. 225-30.  He asked her to confirm her lies on the stand, which she did multiple times.  T.T. pp. 227-30.  Defense counsel effectively challenged Katie on the motivation behind the two interviews.

Finally, Walker claims there was insufficient evidence to support the *mens rea* element of his conviction for receipt of materials depicting the sexual exploitation of minors.  However, a sufficiency of the evidence claim is non-cognizable on collateral review.  Houser v. United States, 508 F.2d 509, 513-14 (8th Cir. 1974) (noting sufficiency of the evidence claims must be raised on direct appeal); Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994) ("A claim that all of a crime's statutory elements were not proven is not a constitutional claim for the purposes of collateral attack."); United States v. Johnson, 582 F.2d 1186, 1188 (8th Cir. 1978) ("Generally, an alleged insufficiency of the evidence is not a ground for relief under § 2255.").

Walker has failed to demonstrate any deficient performance or prejudice in his fourth claim of ineffective assistance of counsel.

### E.    CLAIM FIVE

Walker's fifth claim of ineffective assistance is that defense counsel failed to challenge the sufficiency of the indictment.  First, Walker claims defense counsel informed him at some point during the representation that the indictment was constitutionally deficient.  Second, Walker attacks the indictment, claiming it does not properly identify him, or in the alternative, that his conviction for aiding and abetting constituted a constructive amendment of the indictment.

Walker's contentions have no merit.  Defense counsel denies knowing of any viable legal challenge to the sufficiency of the indictment.  See Doc. No. 209-1, ¶ 11.  Walker has procedurally defaulted on any such claims by failing to raise them on direct appeal.  "The general rule is that, after

conviction, a sentence is not open to collateral attack on the ground that the information or indictment upon which it was based was defective." Keto v. United States, 189 F.2d 247, 249 (8th Cir. 1951). "Claims not made during district court proceedings or on direct appeal are procedurally defaulted and may not be raised for the first time in a § 2255 motion." United States v. Hamilton, 604 F.3d 572, 574 (8th Cir. 2010); Cassidy v. United States, 428 F.2d 585, 587 (8th Cir. 1970) ("Section 2255 does not exist to correct erroneous factual determinations . . . or to correct errors which should have been brought to the attention of the trial court of the appellate court on direct appeal."). No exceptional circumstances, such as lack of jurisdiction, exist in this case which would allow Walker to avoid his procedural default. Keto, 189 F.2d at 251.

### F.    CLAIM SIX

In his final claim of ineffective assistance, Walker contends defense counsel failed to seek out additional reports from private investigator Carrie Abbey and failed to seek records from the digital forensic analyst hired by his first attorney. Walker also claims defense counsel failed to seek out and provide to the Court additional letters of support at his sentencing.

As to the first claim, Abbey worked on Walker's case as a private investigator for only a brief period of time prior to Attorney Sandberg taking over representation. During that time she only interviewed Walker and Huston and did not produce any written reports. See Doc. Nos. 204-1 and 204-3. Abbey was not retained by Attorney Sandberg, but did provide him audio recordings of her interviews with Walker and Huston. Id. Abbey confirmed on two occasions she did not produce any investigative reports and that the only materials left in her possession are the recording of her interview with Huston and notes of her investigation. See Doc. Nos. 195-4 and 204-1. Walker has

failed to demonstrate Abbey generated any additional reports that would have been helpful to his case or that failing to retain Abbey for further investigation prejudiced the defense. Huston was not called as a witness by the Government or the defense, so her interview essentially became irrelevant. Whatever information Walker himself had he should have provided to defense counsel. As the Court explained above, it would have been disastrous for the defense to call Huston as a witness. In retrospect, it no doubt appears to Walker that defense counsel inadequately defended him. However, Walker fails to acknowledge the strength of the Government's case, which included his co-defendant pleading guilty and testifying against him, the evidence provided by the Government's case agent, and all the corroborating and damning messages exchanged between Walker and Katie. Walker's contention regarding Abbey fails.

As to the digital forensic analyst hired by his first attorney, Walker presents nothing more than speculation and baseless conclusions about that analyst's findings, which he claims would have proven he did not open or solicit the sexually explicit images from Katie. Attorney Sandberg hired his own digital forensic analyst, Dan Meinke, to do a complete review of the data prior to trial. See Doc. No. 209-1, ¶ 6. Both analysts had access to the same data. Defense counsel with the analyst on his findings multiple times and decided not to call him as a witness. Walker offers no evidence to support his assertion that the first analyst's findings would have been helpful to him or that defense counsel should have called Meinke as a witness. There is no evidence in the record that defense counsel did not act reasonably in fully investigating the digital evidence.

Finally, Walker points to two letters of support he contends defense counsel should have filed prior to sentencing. See Doc. Nos. 195-6 and 195-7. Defense counsel states he "guesses" he did not see these two letters prior to sentencing, but that even if he had, he would not have submitted the

35

letter from Walker's brother (Doc. No. 195-7), but would have submitted the letter from Walker's ex-wife. See Doc. No. 195-5. The letter from Walker's wife is not in the record. The letter at Doc. No. 195-6 is from Walker's brother-in-law. Though Walker claims there were other letters of support, he provides no proof those ever existed. Defense counsel states he only received the two letters. The Court has reviewed the letters in the record and concludes they would not have effected the sentence imposed. Walker's offense conduct was egregious. The Government asked for a 720-month sentence, while the defense asked for 360-months. The Court settled on 540-months. The letters, while somewhat helpful to Walker, would not have changed the Court's sentencing determination given the nature of the offense conduct, the number of victims, and the strength of the Government's case. Letters from family, friends, and co-workers would not have persuaded the Court to be any more lenient than it was. As such, Walker suffered no prejudice.

## IV.   **CONCLUSION**

The Court has carefully reviewed the entire record, the parties' filings, and the relevant case law. For the reasons set forth above, the Defendant's motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 195) is **DENIED**. The Defendant's motion to strike (Doc. No. 224) is also **DENIED**. In addition, the Court issues the following **ORDER**:

(1.) The Court certifies that an appeal from the denial of this motion may not be taken *in forma pauperis* because such an appeal would be frivolous and cannot be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

(2.) Based upon the entire record before the Court, dismissal of the motion is not debatable, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings. Therefore, a certificate of appealability will not be issued by this Court. Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983).

If the Defendant desires further review of his motion, he may request the issuance of a certificate of appealability by a circuit judge with the Eighth Circuit Court of Appeals.

**IT IS SO ORDERED.**

Dated this 21st day of May, 2026.

/s/ *Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court